UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DANIEL GARZA,                              )
   Plaintiff,                            )
                                  )
vs.                                        )          No. 19-2321
                                    )
WEXFORD HEALTH SOURCES,                     )
INC., et. al.,                             )
   Defendants.                           )

SUMMARY JUDGMENT ORDER

JAMES E. SHADID, U.S. District Judge:

This cause is before the Court for consideration of Defendant Lisa Hopp's Motion for Summary Judgment [68] and Defendants Steven Kottemann, Elicia Pearson, Tamara (Tammy) Wilson, Justin Young, and Wexford Health Source's Motion for Summary Judgment. [71].  For the following reasons, the motions are GRANTED. [68, 71].

I. BACKGROUND

Plaintiff, a *pro se* prisoner, claims Defendants Dr. Young, Dr. Kottemann, Nurse Pearson, Nurse Wilson, Healthcare Administrator (HCA) Lisa Hopp, and Wexford Health Sources violated his constitutional rights at both Danville and Lincoln Correctional Centers.  Specifically, Plaintiff says the Defendants were deliberately indifferent to his serious medical condition, a hernia.

Plaintiff claims his hernia continued to grow and increase in pain.  Nonetheless, doctor visits were delayed, the wrong hernia belt was provided, corrective surgery was

refused, and Defendants persisted with an ineffective course of treatment. Plaintiff further alleges Wexford had a policy and practice of delaying or failing to approve hernia surgery to save costs.

Attempts were made to find counsel to represent Plaintiff in this case. On May 19, 2021, the Court granted Plaintiff's motion for recruitment of *pro bono* counsel. *See* May 19, 2021 Case Management Order. The Court noted while it appeared "Plaintiff may be competent to represent himself," it would still attempt to find an attorney willing to represent him. May 19, 2021 Case Management Order, p. 5. Unfortunately, the Court's efforts were not successful. See June 23, 2021 Case Management Order (contacts with local attorneys and email to more than 1, 550 attorneys).

Nonetheless, the Court did not find Plaintiff was not competent to litigate this case. Plaintiff has some, limited litigation experience. See *Garza v. Cook County Department of Corrections*, Case No. 14-4252. His complaint clearly and coherently explained his claims as well as the involvement of each named Defendant, and provided numerous, relevant medical records and grievances. (Comp., [1], p. 15-72). Defendants provided both initial and supplemental discovery disclosures. [32, 56]. Defendants also confirmed Plaintiff was provided access to the law library during this litigation and the Court advised Plaintiff he could ask for additional time if needed to meet any deadline. *See* September 14, 2020 Text Order. Finally, the docket demonstrates Plaintiff participated in discovery sending Requests for Admission of Fact, Interrogatories, and Requests to Produce to the Defendants. [35, 41, 47].

Defendants responded with hundreds of pages of documents. (Plain. Mot., [49], p. 6, 9, 12-146).

Furthermore, unlike many *pro se* litigants, Plaintiff responded to each motion for summary judgment separately and to the statements of undisputed facts. (Plain. Resp., p. 1-10 (Med. Def.), p. 11-18 (IDOC Def.), p. 19-86 (exhibits)). Despite the inability to find counsel to represent Plaintiff, he adequately participated in discovery and responded to the pending dispositive motions.

## II. FACTS

### A. DANVILLE CORRECTIONAL CENTER

Plaintiff transferred to Danville Correctional Center on February 15, 2017. (Def. Mot., [71], Yng. Aff., p. 1). Defendant Dr. Young was a physician at Danville from September 2016 through June 2020. (Def. Mot., [71], Yng. Aff., p. 1). Defendant Wilson was the Director of Nursing (DON) at Danville from June 3, 2004 through March 24, 2018. (Def. Mot., [71], Wil. Aff., p. 1). Defendant Pearson remains at Danville where she has worked as a practical nurse for approximately 13 years. (Def. Mot., [71], Prsn. Aff., p. 1). All three Defendants were Wexford Health Sources employees.

Danville inmates can request medical care any day through the sick call process (Def. Mot., [71], Prsn. Aff., p. 1). Nurses then meet with inmates suffering from nonemergency medical conditions and "provide care within their physician-approved nurse-treatment protocols." (Def. Mot., [71], Prsn. Aff., p. 2). If a nurse cannot address an inmate's medical complaints, the inmate is referred to a mid-level nurse practioner or a doctor. (Def. Mot., [71], Prsn. Aff., p. 2).

Defendant Wilson says in her role as DON, she did not routinely provide direct patient care. (Def. Mot., [71], Wil. Aff., p. 1). If the Defendant did meet with a patient, she would record the visit in the medical records. Plaintiff's medical record does not include any entries from Defendant DON Wilson. In addition, Defendant Wilson says she does not recall Plaintiff ever speaking to her about his hernia. (Def. Mot., [71], Wil. Aff., p. 2). "If (Plaintiff) had approached me, absent any emergent issue, I would have instructed him to utilize the sick call and/or grievance processes." (Def. Mot., [71], Wil. Aff., p. 2). Defendant Wilson also states she was not responsible for approving or denying inmate grievances. (Def. Mot., [71], Wil. Aff., p. 2).

Plaintiff admits he never spoke directly with Defendant Wilson. Instead, he named her as a Defendant because he believed she had final approval for any referral to an outside provider. (Def. Mot., [71], Plain. Depo., p. 72).

Defendant Nurse Pearson first met with the Plaintiff on August 27, 2017, for his complaints of constipation and an umbilical hernia. (Def. Mot., [71], Prsn. Aff., p. 2).

> An umbilical hernia occurs when part of the intestine bulges through an opening in the abdominal muscles near the navel. Umbilical hernias are common and typically do not require surgical intervention. The hernia is considered reducible when it is possible to push the hernia back into the abdominal cavity. Surgical repair is typically not medically necessary for an umbilical hernia that is reducible. Constipation is a common symptom that occurs with hernia. (Def. Mot., [71], Yng. Aff., p. 2).

Defendant Pearson says her examination revealed Plaintiff was able to "self-reduce" his umbilical hernia, and he showed no obvious signs of discomfort. (Def. Mot., [71], Prsn. Aff., p. 2). Instead, Plaintiff described his hernia pain as "tightness." (Def. Mot., [71], Prsn. Aff., p. 2). Based on the examination. Defendant Pearson did not believe an additional consultation was needed. She provided Plaintiff with fiber tablets to alleviate constipation and ibuprofen as needed for discomfort related this his hernia. (Def. Mot., [71], Prsn. Aff., p. 2).

Defendant Dr. Young's first meeting with the Plaintiff was on October 25, 2017, to address Plaintiff's reports of vertigo. (Def. Mot., [71], Yng. Aff., p. 2). The Defendant Doctor says Plaintiff "did not discuss a hernia with me at the time." (Def. Mot., [71], Yng. Aff., p. 2).

Defendant Nurse Pearson met with Plaintiff again on November 4, 2017, for complaints of an abdominal hernia. (Def. Mot., [71], Prsn. Aff., p. 2). Plaintiff reported a sharp squeezing pain and constipation. (Def. Mot., [71], Prsn. Aff., p. 2-3). Defendant Pearson notes constipation can contribute to hernia discomfort. Therefore, she decided to try a different approach and provided acetaminophen and milk of magnesia. (Def. Mot., [71], Prsn. Aff., p. 3).

Plaintiff met with a different nurse during sick call on November 25, 2017, when his fiber tablets ran out. The nurse reordered the tables and advised Plaintiff to increase his fluid intake and physical activity, and to add fruit, vegetables, and fiber to his diet. (Def. Mot., [71], Prsn. Aff., p. 3).

Plaintiff returned to nurse sick call on December 16, 2017. (Def. Mot., [71], Prsn. Aff., p. 3). Plaintiff complained of throbbing pain that felt like a pinch or pressure which would go away for a day and then return. (Def. Mot., [71], Prsn. Aff., p. 3). Plaintiff said it was hard to work out or move around and he was gaining weight. (Def. Mot., [71], Prsn. Aff., p. 3). Pursuant to the nursing protocols, the treating nurse recommended an examination with a nurse practioner because Plaintiff had previously requested sick call on three occasions with the same complaint. (Def. Mot., [71], Prsn. Aff., p. 3).

Defendant Dr. Young's follow-up appointment to discuss vertigo was scheduled on December 22, 2017. (Def. Mot., [71], Yng. Aff., p. 2). Nurse Pearson was also present during the examination. (Def. Mot., [71], Prsn. Aff., p. 3). Both Defendants Dr. Young and Peterson agree Plaintiff's hernia was not discussed during this appointment. (Def. Mot., [71], Yng. Aff., p. 2).

Plaintiff met with a nurse practioner on January 2, 2018, for complaints related to an umbilical hernia. (Def. Mot., [71], Yng. Aff., p. 2). Plaintiff said he was unable to work out and suffered in pain at night. (Def. Mot., [71], Yng. Aff., p. 2). Plaintiff also stated he was wearing a back brace each day which did help. The nurse advised Plaintiff to increase his water intake, continue taking Fiberlax tablets, and Tylenol for pain. (Def. Mot., [71], Yng. Aff., p. 2-3). The nurse practitioner also referred Plaintiff to the doctor for further evaluation.

Plaintiff was originally scheduled to meet with Defendant Dr. Young on January 15, 2018, but it was rescheduled to February 6, 2018, due to a scheduling conflict. (Def. Mot., [71], Yng. Aff., p. 3). On January 31, 2018, Plaintiff transferred to Stateville Correctional Center on a writ and he did not return until February 21, 2018. (Def. Mot., [71], Yng. Aff., p. 3). Therefore, the doctor's visit was again rescheduled.

Plaintiff ultimately met with Defendant Dr. Young on March 13, 2018. (Def. Mot., [71], Yng. Aff., p. 3). Plaintiff reported pain at the hernia site and occasionally straining with bowel movements. Plaintiff denied any nausea, vomiting, fever, or chills. (Def. Mot., [71], Yng. Aff., p. 3). The Defendant observed Plaintiff was not in obvious distress, his abdomen was soft, with a small ventral lateral hernia that was tender to palpitation. (Def. Mot., [71], Yng. Aff., p. 3). The Defendant also noted normal bowel sounds for all four quadrants.

Defendant Dr. Young diagnosed Plaintiff with a ventral umbilical hernia which was reducible and stable. The medical record states plaintiff "admits that it is reducible." (Def. Mot., [71], Med. Rec., Bates #31). The Doctor advised Plaintiff to avoid straining or heavy lifting, increase his water intake, and continue taking fiber tablets. Defendant Dr. Young added a prescription for Colace to help with constipation  The Defendant also requested an "abdominal binder,"" issued a low bunk permit, ordered analgesics as needed, and encouraged Plaintiff to lose weight since additional weight could make a hernia worse. (Def. Mot., [71], Yng. Aff., p. 3).  Finally, Plaintiff was advised to follow-up in the general medical clinic for continued monitoring of his hernia. (Def. Mot., [71], Yng. Aff., p. 3).

On April 24, 2018, Defendant Dr. Young says the wrong type of hernia belt was given to Plaintiff.

> There was apparently an error made in the ordering or shipping process for the abdominal binder, because despite my instruction, "Pt encouraged to wear abdominal binder. Please order," the binder initially sent for (Plaintiff) was an inguinal hernia belt, which covers the groin instead of the umbilicus. (Def. Mot., [71], Yng. Aff., p. 4).

Defendant Dr. Young says when he learned about the error, he ordered health care staff to return it and obtain the correct, abdominal binder. (Def. Mot., [71], Yng. Aff., p. 4). When the correct binder arrived, Defendant Dr. Young provided it to Plaintiff on May 24, 2018. (Def. Mot., [71], Yng. Aff., p. 4).

Defendant Dr. Young next met with Plaintiff on July 24, 2018. (Def. Mot., [71], Yng. Aff., p. 4). Nurses referred Plaintiff due to his complaints of continued groin pain. Plaintiff reported he was able to move around without pain, and he had no nausea or

vomiting. (Def. Mot., [71], Yng. Aff., p. 4). At the time, Plaintiff was not wearing the abdominal binder stating it was in the washing machine. Defendant Young noted Plaintiff was able to bend over and pick up a pen from the floor without apparent distress. (Def. Mot., [71], Yng. Aff., p. 4),

Defendant Dr. Young ordered an abdominal x-ray to check for any bowel obstruction causing constipation. The Defendant also ordered the continued use of the abdominal binder, Tylenol for pain, increased water intake, weight loss, and Colace. Finally, the Defendant Doctor advised Plaintiff to avoid heavy lifting. (Def. Mot., [71], Yng. Aff., p. 4). Defendant Nurse Pearson was present during this examination, but her role was limited to taking Plaintiff's vital signs and recording his weight. (Def. Mot., [71], Prsn. Aff., p. 4).

The abdominal x-ray was completed on July 26, 2018. The radiologist reported a moderate degree of stool in the colon suggesting constipation. However, there was no sign of an obstruction. (Def. Mot., [71], Yng. Aff., p. 5).

Defendant Dr. Young next saw the Plaintiff on August 1, 2018, to discuss the x-ray results. The Defendant prescribed magnesium citrate for constipation and again advised Plaintiff to increase his water intake, avoid strain, and follow-up with a nurse practioner. (Def. Mot., [71], Yng. Aff., p. 5). This was Defendant Dr. Young's last visit with the Plaintiff.

On August 22, 2018, Plaintiff met with a nurse practioner. Defendant Pearson took Plaintiff's vital signs and weight prior to the visit, but she had no further involvement. (Def. Mot., [71], Prsn. Aff., p. 4). The nurse practioner ordered Plaintiff to

continue light daily exercise as well as taking fiber tablets, Colace and maintaining a high fiber diet. (Def. Mot., [71], Yng. Aff., p. 5). The nurse also added an additional laxative. (Def. Mot., [71], Yng. Aff., p. 5).

Plaintiff was next seen in the General Medical Clinic on August 27, 2018. The exam noted a 10+ centimeter (3.9 inch) hernia, but no redness or firmness. Plaintiff's prescriptions were continued. (Def. Mot., [71], Yng. Aff., p. 5).

Defendant Nurse Pearson saw Plaintiff during sick call on September 19, 2018. Plaintiff complained of right-side stomach pain which felt like a "knot." (Def. Mot., [71], Prsn. Aff., p. 4). Defendant Pearson did not observe any obvious signs of discomfort and Plaintiff was receiving a laxative and Tylenol. Defendant Pearson added ibuprofen for pain. This was Defendant Pearson's last visit with the Plaintiff.

Defendant Dr. Young says whether surgical repair is needed for an umbilical hernia is based on a variety of factors including "the size, location, reducibility, and disruption of daily activities. "(Def. Mot., [71], Yng. Aff., p. 5).

> Based on my examination of (Plaintiff), his umbilical hernia was reducible and stable. (Plaintiff) moved appropriately and had no suggestion his reducible hernia was significantly impacting his activities of daily living. A surgical consult was not medically warranted, and his hernia symptoms were appropriately managed with use of the abdominal binder and treatment for constipation. (Def. Mot., [71], Yng. Aff., p. 5-6).

Defendant DON Wilson says only physicians can make decisions regarding referring an inmate to an outside provider for surgery. (Def. Mot., [71], Wil. Aff., p. 2).

Defendant Wilson further says she did not have authority to make a referral, had no role in the decision making, and had no ability to override a physician's decision. (Def. Mot., [71], Wil. Aff., p. 2).

When Plaintiff was incarcerated at Danville Correctional Center he worked in the kitchen and as a porter. (Def. Mot., [71], Plain. Depo., p. 23). Plaintiff first worked as a porter who was responsible for general cleaning. (Def. Mot., [71], Plain. Depo., p. 24). Plaintiff worked five days a week from 8:00 a.m. to 2:30 p.m. (Def. Mot., [71], Plain. Depo., p. 25). Plaintiff next worked in the kitchen where his job included sweeping, mopping, and cooking meals. (Def. Mot., [71], Plain. Depo., p. 23). Plaintiff also worked in this job five days a week from 3:00 p.m. to 8:00 p.m. (Def. Mot., [71], Plain. Depo., p. 25-26).

B. LINCOLN CORRECTIONAL CENTER

Plaintiff transferred to Lincoln Correctional Center on October 3, 2018. (Def. Mot., [71], Kot. Aff., p. 1). His transfer records indicated Plaintiff had a hernia and he was provided an abdominal binder. (Def. Mot., [71], Kot. Aff., p. 1). Plaintiff was aware of the sick call process at Lincoln, and he used it when needed. (Def. Mot., [71], Plain. Depo., p. 40, 42).

Defendant Dr. Kottemann was a Wexford employee who served as the Medical Director at Lincoln from October 2014 through February 2020. Defendant Hopp is currently employed by the Illinois Department of Corrections (IDOC) as the Health Care Unit Administrator (HCA) at Lincoln Correctional Center. (Def. Mot., [68], Hopp, p. 1). Although the Defendant is a registered nurse, she does not regularly provide medical care to inmates. Instead, her job is to oversee the daily operations of the Health Care Unit. (Def. Mot., [68], Hopp, p. 1).

Defendant Hopp cannot prescribe medications or approve surgery. (Def. Mot., [68], Hopp, p. 1). Only a physician can recommend surgery which must be approved by Wexford. (Def. Mot., [68], Hopp, p. 1). While Defendant Hopp says she can advocate on behalf of an inmate, the doctors do not have to follow her recommendations. (Def. Mot., [68], Hopp, p. 1). In his deposition, Plaintiff said he sued Defendant Hopp because he believed she had to approve his hernia surgery, but she took no action. (Def. Mot., [68], Plain. Depo., p. 93-94).

Defendant Dr. Kottemann first met with the Plaintiff on February 15, 2019. Plaintiff was wearing the abdominal binder, but not his prescribed back brace. (Def. Mot., [71], Kot. Aff., p. 2). The Defendant Doctor noted "a soft reducible mass in (Plaintiff's) abdomen, approximately three to four inches across." (Def. Mot., [71], Kot. Aff., p. 2). Defendant Dr. Kottemann found Plaintiff had a reducible, umbilical hernia

and provided abdominal pads and gauze to wear under the abdominal binder to provide more support.  Plaintiff claims he was only given gauze on one occasion, and it was not to relieve hernia pain. (Plain. Resp., p.2). The Defendant also prescribed 600 mg. of ibuprofen, every 8 to 12 hours as needed. (Def. Mot. [71], Kot. Aff., p. 2).  Dr. Kottemann did not find Plaintiff's hernia required surgery.

> An umbilical hernia is not generally dangerous, particularly when the herniated contents can easily be returned to their proper place through the hernia defect.  The main risk for significant harm occurs when a loop of bowel become stuck in the hernia defect and cannot be reduced.  In this situation blood supply can be lost, resulting in a medical emergency. (Def. Mot., [71], Kot. Aff., p. 2).

Defendant Dr. Kottemann claims "surgical intervention is generally elective for reducible hernia, as they pose little risk of strangulation." (Def. Mot., [71], Kot. Aff., p. 3).   However, surgery may be done on an "elective basis" if the hernia causes significant pain or disruption of daily activities. (Def. Mot., [71], Kot. Aff., p. 3).

The medical records indicate Plaintiff next sought medical attention regarding his hernia on October 22, 2019 when he was in segregation. (Def. Mot., [71], Kot. Aff., p. 3).  Plaintiff asked if he could keep his abdominal binder in segregation.   A nurse investigated and she was advised Plaintiff could not have the binder if he was housed in segregation. (Def. Mot., [71], Kot. Aff., p. 3).

Defendant Dr. Kottemann next met with Plaintiff on October 25, 2019, for complaints of chest pain. The Defendant Doctor claims Plaintiff did not raise concerns

about his hernia during this visit. (Def. Mot., [71], Kot. Aff., p. 3).  This was the last contact between Plaintiff and Defendant Dr. Kottemann.

Plaintiff filed his complaint in this lawsuit on November 25, 2019. [1].

On August 4, 2020, Plaintiff stopped HCA Hopp while she was conducting COVID-19 temperature checks. (Def. Mot., [68], Hopp, p. 2).  Plaintiff asked whether his hernia would be repaired. (Def. Mot., [68], Hopp, p. 1).  Defendant Hopp examined Plaintiff's hernia and noted it did not require emergency care. (Def. Mot., [68], Hopp, p. 2).  Therefore, she advised Plaintiff to follow up with health care staff if he felt any increase in pain and discomfort. (Def. Mot., [68], Hopp, p. 2).

Defendant Hopp then personally reviewed Plaintiff's medical records on August 5, 2020 and recorded a note in his medical record requesting a doctor's examination. (Def. Mot., [68], Hopp, p. 2).  These are the only contacts Defendant Hopp mentions with the Plaintiff concerning his hernia.

However, Plaintiff recalls two encounters with Defendant Hopp.  During the first meeting, the Defendant made a call and told Plaintiff the request to see a specialist had been denied, but she told Plaintiff she would submit a second request. (Def. Mot., [68], Plain. Depo., p. 85).

Plaintiff claims the second encounter occurred in his housing unit a couple of weeks later. (Def. Mot., [68], Plain. Depo., p. 101-102). Plaintiff complained he still had not seen a specialist. Defendant Hopp advised him to be patient due to the COVID-19 lockdown. (Def. Mot., [68], Plain. Depo., p. 102).

Plaintiff admits the abdominal binder helped with his hernia pain until the beginning of 2020. (Def. Mot., [71], Plain. Depo., p. 69-70). Plaintiff's medical records indicate he received an ultrasound of his hernia in April of 2020. (Def. Mot., [71], Kot. Aff., p. 4). "The ultrasound showed the herniated tissue to be intrabdominal fat, not bowel. Herniated fat poses no substantial risk of harm and repair is elective." (Def. Mot., [71], Kot. Aff., p. 4).

Nonetheless, Wexford ultimately approved Plaintiff's surgery in late 2020. The procedure was delayed due to COVID-19, but Plaintiff underwent surgery on March 18, 2021. (Def. Mot., [71], Plain. Depo., p. 115-116; [68], Hopp, p. 2).

Plaintiff continued his porter job at Lincoln "[m]opping, sweeping, wiping tables down, wiping the walls." (Def. Mot., [71], Plain. Depo., p. 35). Plaintiff also walked laps on the grass when he had yard time. (Def. Mot., [71], Plain. Depo., p. 36-37).

### III. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

## IV. ANALYSIS

### A. IDOC DEFENDANT HOPP

Defendant HCA Hopp first argues she is entitled to summary judgment because Plaintiff did not exhaust his administrative remedies as required before filing his complaint. *See* 28 U.S.C. §1997(e)(a). The Court set a September 14, 2020, deadline for filing any dispositive motions addressing exhaustion. *See* August 12, 2020 Scheduling Order, p. 2, para. 3. While a court may extend a scheduling deadline, the Seventh

Circuit Court of Appeals has held a district court must first specifically consider whether there was "excusable neglect" for the delay in filing a dispositive motion on exhaustion. *Bowman v. Korte*, 962 F.3d 995 (7th Cir. 2020). "This showing is required even if the non-moving party had not suffered prejudice as a result of the delay." *Richmond v. Brookhart*, 2021 WL 148691, at *2 (S.D.Ill. Jan. 15, 2021), *citing Bowman,* 962 F.3d at 998.

Defendant Hopp makes no mention of the deadline set nearly two years ago, nor does she provide a basis for missing the deadline. Therefore, the Court cannot find excusable neglect and will not consider the issue of exhaustion of administrative remedies.

Defendant Hopp next argues she is still entitled to summary judgement because Plaintiff only named her as a Defendant based on his belief the HCA had to approve his hernia surgery. Plaintiff's complaint alleged a doctor told Plaintiff he would need Defendant Hopp's approval before he could receive the surgery.

At merit review, the Court advised Plaintiff it was unlikely a health care administrator had this authority. "Typically, only doctors and Wexford can approve surgery while a Health Care Administrator then schedules the appointment. Nonetheless, Plaintiff may proceed with his claims at this early juncture." April 20, 2020 Merit Review Order, p. 6; *see i.e. L'Minggio v. Wexford Health*, 2020 WL 1062047, at *6 (S.D.Ind. March 5, 2020)(defendant "as a registered nurse, could not approve a

referral to a surgeon or order surgery."); *Montanez v. Trost*, 2016 WL 5243025, at *3 (S.D.Ill. Sept 22, 2016) (dismissing claim against nurse at merit review noting "it is highly unlikely that a nurse…had the authority to approve surgery unilaterally.").

Defendant Hopp has now confirmed while she could advocate for an inmate's medical care, she could not approve or deny outside consultations or surgeries. Only a physician could make this recommendation and Wexford would need to approve that recommendation. Defendant DON Wilson also confirms nurses did not have the authority to approve or deny surgery. (Def. Mot., [71], Wil. Aff., p. 2).

Plaintiff argues HCA Hopp "clearly has some input," because after he spoke to her, he was able to see a specialist. (Plain. Resp., [15]). However, "input" is not the same as authority to approve. Plaintiff has presented only speculation and conjecture concerning Defendant Hopp's role which is insufficient to defeat a motion for summary judgment. *See Hall-Bey v Hanks*, 93 Fed.Appx 977, 980 (7th Cir. 2004) ("conclusory statements cannot sustain a non-movant's burden on summary judgment."); *Stagman v Ryan*, 176 F.3d 986, 995(7th Cir. 1999)("statements that are the result of speculation or conjecture or merely conclusory" do not meet requirements of Rule 56); *Wells v Bureau County*, 723 F.Supp.2d 1061, 1087 (C.D.Ill. July 2, 2010)("[a]t summary judgment, a plaintiff cannot rest on conclusory allegations but rather must come forward with specific citations to evidence in the record supporting his claims."). Defendant Hopp's Motion for Summary Judgment is therefore granted. [68].

II. MEDICAL DEFENDANTS

Medical Defendants Dr. Kottemann, Dr. Young, Nurse Pearson, DON Wilson, and Wexford maintain Plaintiff cannot demonstrate they violated his constitutional rights. To establish an Eighth Amendment violation, Plaintiff must show he suffered from a serious medical need and the Defendant was deliberately indifferent to that need. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir.2008). For purposes of the summary judgment motion, the parties do not dispute Plaintiff suffered from a serious medical condition.

"To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." *Petties v. Carter*, 836 F3d 722, 728 (7th Cir. 2016), *citing Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). In other words, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties,* 836 F3d at 728 (emphasis in original), *citing Farmer v Brennan*, 511 U.S. 825, 844 (1994).

The Seventh Circuit has held "[a] medical professional is entitled to deference in treatment decisions 'unless no minimally competent professional would have so responded under those circumstances.'" *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008), *quoting Collignon v Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Therefore, for a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895 (7th Cir.2008) (internal citations omitted).

Finally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). In addition, mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *Snipes*, 95 F.3d at 591-92.

Defendants Dr. Kottemann and Dr. Young argue no reasonable jury could find they were deliberately indifferent to Plaintiff's hernia. The medical records demonstrate Plaintiff did not suffer from a strangulated hernia or other complication which demanded emergency surgery. *See Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006)(noting three types of hernias: "(1) a hernia that is strangulated, which is a medical emergency mandating surgery; (2) a hernia that is reducible yet so painful or debilitating that surgery is required; and (3) a hernia that is reducible and, given the dangers and risks inherent in any operation, can be treated through non-surgical means"). The Defendant Doctors state each time they met with Plaintiff, he showed no signs of distress, and they observed a stable, reducible hernia.

For instance, Defendant Dr. Young saw Plaintiff on three occasions at Danville Correctional Center and provided new medications for constipation and pain, a low bunk permit, an abdominal binder, fiber tablets and an x-ray to rule out other conditions. The Defendant also provided advice to Plaintiff to help reduce his symptoms such as drinking more water, losing weight, and avoiding strain or heavy lifting. Defendant Young further observed Plaintiff could move and bend without pain.

Defendant Dr. Kottemann met with Plaintiff twice at Lincoln regarding his hernia. During the first visit on February 15, 2019, the Defendant observed a "a soft reducible mass in (Plaintiff's) abdomen, approximately three to four inches across." (Def. Mot., [71], Kot. Aff., p. 2). This was the same size recorded six months prior at Danville's General Medical Clinic. (Def. Mot., [71], Yng. Aff., p. 50). Dr. Kottemann continued the medical treatment previously provided and increased Plaintiff's prescribed pain medication.

Plaintiff did not request any additional care until eight months later when the sole purported purpose of his visit was to obtain the abdominal binder confiscated when he was moved to segregation.

Defendants Dr. Young and Kottemann say based on their examinations and observations, surgery was not medically warranted during the time they provided treatment. Plaintiff's umbilical hernia was stable and easily reducible, and they continued to provide different treatments to address pain and discomfort. In fact, Plaintiff admits the abdominal binder helped with hernia pain until early 2020. (Plain. Mot., [71], Plain. Depo. p. 69). However, neither Defendant Dr. Young, nor Defendant Dr. Kottemann was providing Plaintiff with medical care in 2020. While no further medical records have been provided, it appears Plaintiff's hernia continued to increase in pain and size, or doctors found the treatments which had been provided were no longer effective because hernia surgery was ultimately approved in late 2020.

Plaintiff argues "common sense tells you the only way to fix this problem is surgery." (Plian. Resp., p. 5). While not entirely clear, it appears Plaintiff contends the

Defendants should have recommended surgery when his hernia was first diagnosed. However, "[a] prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). Instead, "the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion… so refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" *Id. quoting Roe v. Elyea,* 631 F.3d 843, 858 (7th Cir. 2011).

In addition, the Seventh Circuit has recognized "not all reducible hernias require surgery." *Heard v. Tilden*, 774 Fed.Appx. 985, 988 (7th Cir. 2019). In *Johnson v. Doughty*, the Seventh Circuit held a physician who evaluated an inmate on multiple occasions for a non-strangulated, non-emergent, reducible hernia was not deliberately indifferent in denying the Plaintiff's surgery. *Johnson,* 433 F.3d at 1014. "Non-surgical remedies, designed to alleviate the inmates' pain from the hernia are not a violation of the Eighth Amendment." *Woods v. Ameji,* 2011 WL 673990, at *11 (C.D.Ill. Feb 16, 2011).

The only question before the Court is whether the decision to deny surgery in Plaintiff's case was "blatantly inappropriate." *Roe,* 631 F.3d at 858. Plaintiff argues he has met this standard because his hernia continued to grow, increased in pain, was harder to reduce, and disrupted his daily activities. In support of his claim, Plaintiff relies on the medical record. (Plain. Resp, p. 4). However, the only recorded measurements of his hernia in the medical records were taken six months apart and were identical. In his deposition, Plaintiff estimated his hernia was about the size of a grape, but he provides no further information such as when it was this size, when it

grew, or whether there was any specific change in size during the times he saw Dr. Kottemann and Dr. Young.

In addition, while Plaintiff says his hernia was harder to reduce, he provides no evidence to support this claim. Plaintiff again points to the medical record which indicates his hernia was easily reducible throughout the relevant time he was treated by Defendants Dr. Kottemann and Dr. Young. In fact, the record indicates Plaintiff admitted his hernia was reducible. (Def. Mot., [71], Med. Rec., Bates #31).

Plaintiff also claims the hernia interfered with his daily activities. For instance, Dr. Young advised him to stop jogging and doing jumping jacks and to instead try less strenuous exercises. In addition, Plaintiff says it was harder to sleep with his hernia. Nonetheless, Plaintiff has not demonstrated his hernia "significantly" affected his daily activities. *See Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008). The evidence before the Court demonstrates Plaintiff continued to exercise and maintained a physical job working six hours a day, five days a week. Furthermore, Plaintiff admits the Defendants tried different alternatives including different medications and strengths to address his pain.

Lastly, Plaintiff claims his pain increased in size and while the abdominal binder did help with his pain, it did not eliminate his pain. Viewing the medial record in the light most favorable to the Plaintiff, he does appear to report more pain during his visits, but each medical provider noted he was not in distress, he was able to move without pain, and there was no indication of acute pain. In addition, the Defendant Doctors responded to his complaints by providing different alternatives to address his

complaints.   It is notable after Defendant Dr. Kottemann provided a stronger pain

medication on February 15, 2019, there is no evidence before the Court demonstrating

Plaintiff complained of hernia pain to the Defendant Doctor, or any other medical

provider, before Dr. Kottemann left the facility in February of 2020.[1] This was Plaintiff's

last visit concerning hernia pain with either Defendant Doctor.

The abdominal binder was only one of the treatments prescribed to address

Plaintiff's complaints of medical pain. "Moreover, constitutionally adequate care does

not require the total alleviation of pain." *Kimbrough v. Schneegas*, 2021 WL 3163936, at *4

(N.D.Ind. July 26, 2021), *citing Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("To say

the Eighth Amendment requires prison doctors to keep an inmate pain-free in the

aftermath of proper medical treatment would be absurd.").

 Furthermore, the medical records consistently indicate Plaintiff was not in

distress, he was able to move, and his hernia was stable and reducible.  While Plaintiff

would have preferred to receive surgery when his hernia was first diagnosed, he has

not presented evidence suggesting the conservative care provided by Defendant Young

or Defendant Kottemann was either blatantly inappropriate or a substantial departure

from accepted professional judgment, practice, or standards.  Instead, the Defendants

tried a variety of options to address his complaints of pain which Plaintiff admits were

initially helpful.  At some point after Plaintiff left the Defendants care, those measures

---

[1] While Plaintiff did meet with the Defendant in October of 2019, the only issue
addressed was whether he could have his abdominal binder in segregation.

became ineffective, and surgery was approved. Defendants Young and Kottemann's Motion for Summary Judgment is granted. [71].

Plaintiff does not specifically mention either Defendant Nurse Pearson or DON Wilson in his response. (Plain. Resp.). Defendant Nurse Pearson, liked the Defendant Doctors, provided different treatment options to address Plaintiff's complaints. When Plaintiff returned a third time, she followed the established protocols and referred a nurse practioner or doctor. In addition, the Defendant Doctors agreed with Nurse Pearson's conservative treatment plan.. More important, Nurse Pearson could not approve surgery.

Defendants note in his deposition, Plaintiff stated one of the reasons he was suing Defendant Pearson is because she charged a $5 copay to his Trust Fund Account each time she met with Plaintiff. (Def. Mot., [71], Plain. Depo., p. 73-74). IDOC has a policy which requires inmates to pay the $5 co-pay when healthcare staff meets with the inmate for non-emergent issues. (Def. Mot., [71], Prsn. Aff., p. 2). Defendant Pearson was not involved in developing either IDOC's co-pay policy or nursing protocols. (Def. Mot., [71], Prsn. Aff., p. 2, 4).

In addition, Plaintiff does not allege he could not afford the copayments, nor that he was denied medical care based on a failure to pay. *See. Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012) ("[T]he imposition of a modest fee for medical services, standing alone, does not violate the Constitution."); *Sims v. Jairret*, 2018 WL 2433585, at *3, FN 2 (S.D.Ill. May 30, 2018)("An inmate's constitutional rights are not violated by the collection of a fee for prison medical or dental services.").

Defendants further argue DON Wilson had no personal involvement in Plaintiff's allegations. To hold an individual liable under Section 1983, Plaintiff must "show that the defendants were personally responsible for the deprivation of their rights." *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 469 (7th Cir. 2016). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id. quoting Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Plaintiff admits he never spoke or otherwise communicated with Defendant Wilson concerning his hernia, and Defendant Wilson has confirmed she did not have authority to make a referral to an outside provider and she had no ability to override a physician's decision. Therefore, Defendants' Pearson and Wilson's Motion for Summary Judgment is granted. [71].

Finally, Plaintiff has no evidence to support his official capacity claim against Defendant Wexford Health Sources. Wexford can only be held liable under 42 U.S.C. §1983 if it had an unconstitutional policy or practice which caused the alleged deprivation. *See Woodward v Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004); *Monell v. N.Y. City Dep't of Soc. Svcs.*, 436 U.S. 658, 694 (1978). In this case, "Wexford cannot be held liable for damages because there is no underlying constitutional violation." *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014); *see also Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1035 (7th Cir. 2019); *Powell v. Shah*, 618 Fed.Appx. 292, 296 (7th Cir. 2015); *Williams v. Sood,* 2018 WL 10811477, at *15 (C.D.Ill. March 8, 2018).

Even if Plaintiff had sufficiently demonstrated an underlying violation, he has still failed to establish an Eighth Amendment claim against Wexford. "Plaintiff must show that the alleged constitutional violation was caused by: (1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that was so permanent and well-settled that it constituted a custom or practice; or (3) a person with final policymaking authority." *Ridgeway v. Wexford Health Sources*, Inc., 2022 WL 124447, at *5 (S.D.Ill. Jan 13, 2022); *citing Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Plaintiff has made no such showing.

The Medical Defendants' Motion for Summary Judgment is granted in its entirety. [71].

IT IS THEREFORE ORDERED:

1) Defendant Lisa Hopp's Motion for Summary Judgment [68] and Defendants Steven Kottemann, Elicia Pearson, Tamara Wilson, Justin Young, and Wexford Health Source's Motion for Summary Judgment [71] are both GRANTED pursuant to Federal Rule of Civil Procedure 56. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs.

2) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *See also Celske v*

*Edwards*, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective).   If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

Entered this 18th day of July, 2022.


s/ James E. Shadid

_____

JAMES E. SHADID
UNITED STATES DISTRICT JUDGE